UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

ANDREW R. DILLARD,                    )
                                      )
              Plaintiff,              )
                                      )
         vs.                          )        No. 4:07-CV-1583 (CEJ)
                                      )
MICHAEL J. ASTRUE,                    )
Commissioner of Social                )
Security,                             )
                                      )
              Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse
ruling by the Social Security Administration.

## I.  Procedural History

On June 7, 2006, plaintiff Andrew R. Dillard protectively
filed applications for disability benefits under Title II of the
Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental
security income (SSI) benefits under Title XVI of the Act, 42
U.S.C. §§ 1381 *et seq.*, (Tr. 60-65), with an alleged onset date of
April 4, 2006.  After plaintiff's applications were denied on
initial consideration (Tr. 29-33), he requested a hearing from an
Administrative Law Judge (ALJ). (Tr. 34).

The hearing was held on April 17, 2007.  Plaintiff was
represented by counsel. (Tr. 220-35).  The ALJ issued a decision
on June 18, 2007, denying plaintiff's claims. (Tr. 13-22).  The
Appeals Council denied plaintiff's request for review on August 7,
2007. (Tr. 5-7).  Accordingly, the ALJ's decision stands as the
Commissioner's final decision.  See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the time of the hearing, plaintiff was 53 years old.[1]  (Tr. 222).  He had completed two years of college education without obtaining a degree.  (Tr. 222-23).

Plaintiff worked as a lab technician from 1977 until 2003, when his job was eliminated in a company acquisition.  (Tr. 89, 223).  Plaintiff subsequently attended school to become a truck driver.  He succeeded in obtaining a job, but was fired within a short time because he got lost repeatedly and had a string of minor accidents.  (Tr. 224).  Plaintiff testified that he fared no better on an assembly line, where he was fired after seventeen days because he could not maintain the required error-free pace.  (Tr. 228).  He also testified that toward the end of his employment as a lab technician, he began to have trouble maintaining his pace and completing tests that he knew how to perform. (Tr. 228).

Plaintiff testified that he received medication and therapy for the treatment of depression.  (Tr. 224-25).  The depression affected plaintiff's ability to concentrate: he described having difficulty crossing the street, keeping turn signals straight, and knowing "which lane is which."  (Tr. 225).  He also experienced uncontrollable crying about twice a week.  (Tr. 229).  He was taking Wellbutrin for the treatment of depression with limited effectiveness.  In addition, the medication caused headaches.  (Tr. 230).

---

[1]According to the transcript, plaintiff testified that he was 63 years old.  This appears to be a transcription error.

Plaintiff underwent surgery to remove a bone spur in his left foot. He saw a doctor every six weeks to remove built-up skin at the surgical site. He also was treated for high blood pressure and glaucoma. (Tr. 226).

In response to a question from counsel regarding his slow speech, plaintiff testified that he had difficulty finding "the right words . . ., getting them out and pronouncing them." He thought this difficulty was related to depression or anxiety. He testified that he had stopped driving because he was afraid that he might hurt someone. (Tr. 227).

Jeffrey Magrowski, Ph.D., a vocational expert, provided testimony in response to several hypothetical scenarios. In the first, he was asked about the employment opportunities for an individual with fourteen years of education and plaintiff's work history; the ability to perform the full range of light work; the ability to lift and carry 50 pounds occasionally and 25 pounds frequently; the ability to sit, stand or walk for six out of eight hours; and no further restrictions. Dr. Magrowski testified that such an individual would be able to return to past relevant work as a quality control technician. (Tr. 232-33).

In the second scenario, the vocational expert was asked to assume that the same hypothetical individual had the ability to understand, remember, and carry out simple instructions and non-detailed tasks; the ability to respond appropriately to supervisors and co-workers in a task-oriented setting where contact with others is casual and frequent; the ability to adapt to routine, simple

work changes; and the ability to take appropriate precautions to avoid work hazards. According to Dr. Magrowski, such an individual could not return to the past relevant work as a quality control technician, but could perform work as a bagger of small products. He further testified that there were approximately 150,000 such jobs in the national economy and 2,500 in the State of Missouri. (Tr. 233).

The vocational expert was also asked to assume that the hypothetical worker was not completely oriented, was markedly to severely impaired in the ability to complete simple tasks, and was markedly to severely impaired in the area of concentration, persistence and pace, with a current Global Assessment of Functioning (GAF)[2] score of 45. The elements of this hypothetical were drawn from the Psychological Evaluation of plaintiff completed by Consultative Examiner, Thomas Davant Johns, Ph.D. (Tr. 148-49). Dr. Magrowski testified that there would be no jobs that such an individual could perform in the national economy. (Tr. 234).

Plaintiff completed a Disability Report as part of his application. (Tr. 81-88). He listed the following disabling conditions: depression, high blood pressure, and "problems" with his left foot and eyes. These conditions caused diminished

---

[2]The GAF is determined on a scale of 1 to 100 and reflects the clinician's judgment of an individual's overall level of functioning, taking into consideration psychological, social, and occupational functioning. Impairment in functioning due to physical or environmental limitations are not considered. American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 32-33 (4th ed. 2000).

concentration and memory lapses; he reported that he had problems with getting lost and repeating himself. (Tr. 82).

Plaintiff completed a form entitled "Claimant's Work Background." (Tr. 126). Plaintiff reported that he worked as an environmental Technician (Quality Control) for 26 years, from 1977 through 2003. He worked for one month on an assembly line in 2005, and for a little more than three months as a truck driver in 2006. A wage report showed that plaintiff earned less than $5,000 per year after he was laid off in late 2003. (Tr. 70). He did not receive unemployment benefits in 2005 or 2006. (Tr. 73).

Plaintiff also completed a Function Report. (Tr. 104-11). He reported that his daily activities included watching televison and drowsing. (Tr. 104-05). Plaintiff noted that his medications caused dizziness and drowsiness. (Tr. 111). He described his ability to dress himself as unimpaired, but that he did not "want to" bathe, care for his hair, or shave, and that he needed reminders to take care of his grooming. (Tr. 105-06). He prepared one meal a day, although he occasionally skipped doing that. (Tr. 106). In response to a question regarding the kind of food he prepared, plaintiff listed sandwiches, salad, meat, pasta, and meals with two side dishes. In response to questions about house and yard work, plaintiff stated that he did laundry about once a month and indoor cleaning once a week. He went grocery shopping twice a week. He had no impairments in his ability to pay bills, use a check book, or count change. (Tr. 107). Plaintiff described his interests and hobbies as watching television, "every day, all

day." He did not engage in any social activities, attend church or sports events, or belong to any social groups. (Tr. 108). He indicated that he did not have trouble getting along with others but also stated that, since his illness began, he did not trust others. (Tr. 109).

Plaintiff described the following abilities as affected by his illnesses: walking, seeing, remembering, completing tasks, concentrating, understanding, and following instructions. He stated that walking was painful and that he need to rest for five minutes after walking about 100 feet. His difficulties with memory and concentration impaired his ability to read a map and follow directions. He stated that he had had a string of traffic accidents, which led to the termination of his job as a truck-driver. ((Tr. 109).

In response to a question about how well he handled stress, plaintiff wrote, "Not very well at all. I feel stress about being stressed. Need income for utilities, have grass cut, pay overdue real estate taxes." He also wrote that he did not handle changes in routine well. He reported that he had thoughts of suicide and needed therapy. (Tr. 110).

A Third-Party Function Report was completed on June 22, 2006 by Lorraine Spinks-Davis, who was described as plaintiff's friend. (Tr. 96-103). Ms. Spinks-Davis indicated that she had known plaintiff for 28 years. She stated that she drove him to appointments and to the store. (Tr. 96). With respect to his present condition, Ms. Spinks-Davis indicated that plaintiff used

to be able to work, read, clean his house, and take care of himself. He later appeared tired and depressed all the time and needed encouragement to complete personal care. (Tr. 97). She stated that, in addition, he needed reminders to take his medication. He appeared unmotivated and no longer kept his house clean. (Tr. 98). He had no hobbies and engaged in no social activities. (Tr. 100). She indicated that plaintiff's condition affected his ability to squat, kneel, bend, stand, reach, complete tasks, walk, and concentrate. Additionally, plaintiff did not appear to be steady or strong; his concentration was impaired and he was unable to follow written or spoken instructions. (Tr. 101). She stated that sometimes she was afraid for plaintiff, because at times he sounded so depressed and wanted to give up. (Tr. 102).

## III. **Medical Evidence**

Plaintiff had an initial visit at the Florence Hill Ambulatory Care Center on October 10, 2005. Plaintiff's conditions included hypertension, glaucoma, and cloudy ears. (Tr. 135). A nerve fiber analysis was completed on October 31, 2005, and confirmed that plaintiff had "open angle glaucoma." (Tr. 139-42). Plaintiff returned to Florence Hill Center for a scheduled follow up on November 2, 2005, and received a referral to a podiatrist for treatment of post-surgical foot pain. (Tr. 133). A podiatry note dated November 8, 2005, recommended callous debridement once a month. (Tr. 132). The record reflects that plaintiff had frequent office visits with a podiatrist.

On May 3, 2006,[3] plaintiff's physician noted that his depression was stabilized with Zoloft and Wellbutrin. (Tr. 202). However, on June 28, 2006, it was noted that plaintiff complained that the Wellbutrin was causing daytime somnolence. The physician described plaintiff as "inappropriate given current situation." (Tr. 201).

Psychologist Thomas Davant Johns, Ph.D., completed a consultative evaluation on August 10, 2006. (Tr. 143-49). Plaintiff "presented as markedly depressed and self-deprecating. Nevertheless, he was cooperative in providing information . . ., extremely articulate and . . . a good historian." Plaintiff endorsed most neurovegetative signs of depression. (Tr. 143). He slept twelve to fourteen hours per day and had lost a significant amount of weight in recent months. (Tr. 144). Motor activity was "slowed up," with a slow gait. His facial expression was dull. He was spontaneous in his verbalizations and coherent, relevant and logical. (Tr. 146). Dr. Johns observed no disorganized thinking; however, plaintiff was not completely oriented, in that he did not know whether the day was Wednesday or Thursday, and whether it was August 7th or August 10th. (Tr. 147). Dr. Johns noted that plaintiff demonstrated a marked degree of social isolation and opined that plaintiff would be "markedly to severely impaired in his ability to complete even simple tasks in a timely manner over

---

[3]There is a gap in the medical records provided, however, it is evident from the content of the notes that plaintiff received treatment in the interval.

a sustained period of time uninterrupted by symptoms of depression." Dr. Johns diagnosed plaintiff with major depressive disorder, recurrent, currently severe without psychotic features and with melancholia, and assigned a GAF of 45.[4] (Tr. 148). Dr. Johns described plaintiff's prognosis as "guarded." He further noted that, although plaintiff had "recently instituted antidepressant treatment, he reports no discernable clinical effect as yet. In addition, the [plaintiff] is significantly socially isolated and unable to pay for recommended psychotherapy." (Tr. 149).

Plaintiff was seen for intake at Community Psychological Service on September 13, 2006, to address concerns of depression and anxiety.[5] (Tr. 183-87). Plaintiff reported that his symptoms began when his job was eliminated. He lost a house to foreclosure, his utilities were shut off, and he sold his car. He attended truck-driving school, taking ten weeks to complete the four-week program. He was fired from his first job as a truck driver because he had frequent accidents and kept getting lost. Plaintiff reported that he was living in a house he inherited from his mother and that he would kill himself if he lost the house. He had

---

[4]A GAF of 41-50 corresponds with "serious symptoms OR any serious impairment in social occupational, or school functioning." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

[5]Plaintiff's treatment was provided by Megan Garza, MA, psychological trainee, and was supervised by Teresa Flynn, Ph.D., licensed clinical psychologist. Thus, the Intake Report and session notes are signed by both Ms. Garza and Dr. Flynn. Ms. Garza alone signed the Mental RFC Questionnaire.

previously planned to shoot himself in the head, but denied any suicidal intent at the time of intake (Tr. 183), and reported that he had given his handgun to a neighbor. (Tr. 187). He entered into written and verbal contracts to refrain from harming himself. Id.

Plaintiff reported that he experienced tearfulness, fatigue, hypersomnia, irritability, poor concentration, low self-esteem, and feelings of guilt, worthlessness, and hopelessness. He completed the Beck Depression Inventory-2, receiving a score of 47, which placed him in the severely depressed range. Plaintiff had been taking Wellbutrin for two months, but it did not alleviate his symptoms. Plaintiff was advised to ask his primary care doctor to increase the dosage. Id. Plaintiff also reported that in the previous five months he had experienced recurrent panic attacks, during which he felt intense pain, faintness, nausea, shortness of breath and a racing heart. Finally, plaintiff reported that he had a life-long history of worrying to excess, with symptoms such as restlessness, fatigue, poor concentration, irritability, muscle tension, and poor sleep. These symptoms significantly interfered with plaintiff's life and caused him a great deal of distress. (Tr. 184). Plaintiff reported poor social functioning at the time of his intake assessment. (Tr. 185).

Upon mental status examination, plaintiff was oriented in all spheres. His affect was normal, and he was calm and cooperative, occasionally smiling or laughing, with jokes throughout the interview. However, his rate of speech was slow and he spoke in a

flat tone. His receptive and expressive language comprehension appeared to be intact in that he could follow simple commands and accurately repeat words and phrases. However, he was unable to concentrate long enough to spell the word "house" backward and was unable to correctly recall three words in a list after a short delay. Plaintiff was diagnosed with major depressive disorder, severe, without psychotic features; panic disorder with agoraphobia, and generalized anxiety disorder. His GAF (current) was 33.[6] (Tr. 186).

The record contains a note dated January 11, 2007,[7] for 80 minutes of individual therapy. Plaintiff reported his mood as "not good," and rated his depression at a level of eight (presumably, of ten). Similarly, his score on the Beck Depression Inventory-2 was 50, indicative of severe depression. He denied suicidal ideation. His affect was better than his stated mood and he made several jokes. Plaintiff reported that he was worried about his ability to pay his bills, refill his prescriptions, and pay for upcoming medical appointments. (Tr. 182).

Megan Garza completed a Mental Residual Functional Capacity Questionnaire on January 27, 2007. (Tr. 168-72). She reported

---

[6]A GAF of 31-40 corresponds with "some impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

[7]The session on January 11, 2007, is identified as Session 14. Notes for session 1 through 13 are not included in the record.

that plaintiff had made limited progress in fourteen sessions of treatment. He continued to present with depressed mood, blunted affect, "slowed motor responses from original intake," difficulty with word finding, extreme fatigue and hypersomnia, and decreased appetite with weight loss. He continued to experience anxiety and panic attacks. Ms. Garza defined plaintiff's prognosis as poor. (Tr. 168). Among the symptoms that plaintiff presented were decreased energy, suicidal thoughts, psychomotor retardation, memory impairment, and feelings of guilt or worthlessness. (Tr. 169).

Ms. Garza also assessed plaintiff's abilities to do unskilled work, rating him as unable to meet competitive standards or possessing no useful ability to function in several areas, including: remembering work-like procedures; carrying out short and simple instructions; making simple decisions; completing a workday and workweek without interruption from symptoms; performing at a consistent pace; responding appropriately to changes; dealing with normal work stress; and being aware of, and taking precautions against, normal hazards. (Tr. 170). Ms. Garza similarly rated plaintiff as having no useful ability to understand, remember, and carry out detailed instructions. (Tr. 171). She described plaintiff as friendly and cooperative, but uncomfortable in social situations and inclined to disclose too much regarding his financial and emotional difficulties to strangers. Despite his lengthy history in skilled work, plaintiff presently had severe cognitive limitations. (Tr. 171). Ms. Garza opined that plaintiff

was likely to appear for work but be unable to perform adequately. (Tr. 172).

Treatment notes dated February 6, February 13, March 6, and March 16, 2007 indicate little significant change in plaintiff's condition. (210-13). On one occasion, plaintiff reported that he wished to become a subject in a research study so that he could "obtain better medication and . . . speak with a physician." (Tr. 210). In three out of the four sessions, plaintiff described his mood as poor. In three sessions, it was noted that he made self-deprecating jokes. In one session, plaintiff discussed his estrangement from family and friends, and indicated that he would "like a chance at a new relationship with a woman." (Tr. 213). In another session, he acknowledged increased suicidal ideation due to his financial condition. (Tr. 212). The highest GAF assessed to plaintiff was 38.

## IV.  **The ALJ's Decision**

In the decision issued on June 18, 2007, the ALJ made the following findings:

1.    Plaintiff had not engaged in substantial gainful activity since April 4, 2006.

2.    The plaintiff had depression, which is a severe impairment. Plaintiff alleged having glaucoma, hypertension, left foot pain, and an enlarged thyroid. These impairments had less than a minimal effect on plaintiff's ability to perform work-related functions and are "non-severe" within the regulatory definition. Soc. Sec. Ruling 96-3p.

3.    These medically determinable impairments did not meet or medically equal one of th listed impairments in Appendix 1, Subpart P, Regulation No. 4.

-13-

4.  Plaintiff's allegations regarding his impairments were not totally credible.

5.  Plaintiff's impairments resulted in no exertional limitations. Plaintiff was able to understand, remember, and carry out simple instructions and non-detailed tasks and could adapt to routine or simple changes in the workplace. Plaintiff was limited to work that requires no more than casual interaction with supervisors, co-workers, or the general public. Plaintiff was able to take appropriate precautions to avoid hazards.

6.  Plaintiff had vocationally relevant past work experience as a laboratory technician, truck driver, and assembly line employee.

7.  Plaintiff could not perform his past relevant work.

8.  Plaintiff was closely approaching advanced age.

9.  Plaintiff had a high school education and two years of college education.

10. Considering plaintiff's age, education, and work experience, a finding of "not disabled" was found using Medical-Vocational Rule 204.00 as a framework. There are a significant number of jobs in the state economy that plaintiff can perform, including bagger and bindery work.

11. Plaintiff was not under a disability, as defined in the Social Security Act, at any time through the date of the decision.

(Tr. 21-22).

## V.  Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12

-14-

months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past relevant work. If the claimant can, he is not disabled. Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy. If the claimant

is not, he is disabled. See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

## A. **Standard of Review**

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled." Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001). The Court may not reverse merely because the evidence could support a contrary outcome. Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1. The ALJ's credibility findings;

2. the plaintiff's vocational factors;

3. the medical evidence;

4. the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5. third-party corroboration of the plaintiff's impairments; and

6. when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision. Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999). Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence. Pearsall, 274 F.3d at 1217, citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000).

**B.    Analysis**

Plaintiff's allegations of error attack the ALJ's determination of plaintiff's limitations and Residual Functional Capacity (RFC).

The ALJ determined that plaintiff suffered from depression, a severe impairment. The ALJ concluded, however, that plaintiff's severe impairment did not meet or equal Listing 12.04, 20 C.F.R. Pt. 404, App. 1 to Subpt. P (entitled "Affective Disorders"). In order to meet Listing 12.04, a claimant must establish that his depression results in at least two of the following: (1) Marked restriction of activities of daily living; (2) marked difficulties in maintaining social functioning; (3) marked difficulties in maintaining concentration, persistence, or pace; or (4) repeated episodes of decompensation, each of extended duration. 20 C.F.R. Pt. 404, App. 1 to Subpt. P, § 12.04. The ALJ concluded that plaintiff did not demonstrate limitations such that he satisfied the requirements of Listing 12.04.

The ALJ found plaintiff had no more than mild limitations in his activities of daily living, which the ALJ characterized as

watching television and riding the bus. (Tr. 18). According to the medical reports, plaintiff's chief daily activity was sleeping twelve to fourteen hours per day. The ALJ did not address this level of sleep in considering plaintiff's limitations. The ALJ stated that plaintiff was able to take the bus without social anxiety, but there was no evidence to that effect. According to the ALJ, medical records did not indicate any lapses in plaintiff's personal hygiene, but both plaintiff and Ms. Spinks-Davis indicated that plaintiff was apathetic toward personal grooming. This nonmedical information is consistent with the report by Dr. Johns that plaintiff was not caring for his home.

The ALJ also characterized plaintiff as having only mild impairment of his social functioning. This assessment is based upon the reports that, in therapy sessions, plaintiff was affable, made jokes, and expressed interest in a relationship. The ALJ failed to note that plaintiff's jokes were "self-deprecating" and occurred in sessions in which plaintiff was assessed to be suicidal. The ALJ failed to consider whether the joking was inappropriate given the circumstances, as found by plaintiff's physician. As for plaintiff's desire for a relationship, Ms. Garza and Dr. Flynn did not indicate whether they viewed this desire as healthy or otherwise; indeed, they assessed plaintiff's risk as "Moderate-High" in that session. The evidence does establish that plaintiff was isolated, distrusted others, felt estranged from friends and family, rarely left his home, and engaged in no social activities. The ALJ did not address this evidence; thus, the

determination that plaintiff had adequate social functioning is not supported by substantial evidence on the record as a whole.

The ALJ also determined that plaintiff had no more than mild impairment of concentration, persistence, or pace. By contrast, Dr. Johns determined that plaintiff had marked-to-severe limitations in this area. This medical assessment is consistent with behavioral observations that plaintiff had slowed motor responses, difficulty with word finding, and memory impairment. It is also consistent with plaintiff's report that he had difficulty with pace and/or concentration in three different work settings. In addition, it was noted that plaintiff's cognitive functioning showed signs of deterioration over time. The record does not contain any contrary opinion from any medical provider or consultative examiner regarding plaintiff's limitations.

The ALJ rejected the professionals' assessment of concentration, persistence, or pace as "inconsistent" with observations that plaintiff had intact judgment and could manage his own funds. The ALJ does not cite any authority for the conclusion that concentration, persistence, and pace are correlated with judgment and ability to manage finances. Rather, the ALJ substituted his own unsubstantiated conclusions concerning a mental impairment for the diagnoses of the examining and treating professionals. This disregard of the medical record constitutes error and does not support the ALJ's determination that plaintiff's impairments did not equal Listing 12.04. Pratt v. Sullivan, 956 F.2d 830, 834 (8th Cir. 1992).

The ALJ next determined plaintiff's RFC, finding that plaintiff had no exertional limitations, a finding that goes unchallenged here. With respect to possible nonexertional limitations, the ALJ found that plaintiff was able to understand, remember, and carry out simple instructions and non-detailed tasks; adapt to routine or simple changes in the workplace; and take appropriate precautions to avoid hazards. (Tr. 20).

The RFC is the most that a claimant can do despite physical or mental limitations. Masterson v. Barnhart, 363 F.3d 731, 737 (8th Cir. 2004); § 404.1545. It is the claimant's burden, rather than the Commissioner's, to prove the claimant's RFC. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). It is the ALJ's responsibility to determine the claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own description of his limitations. Id. Ultimately, however, the determination of residual functional capacity is a medical issue, Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000), which requires the consideration of supporting evidence from a medical professional, Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).

Plaintiff contends that, in determining his limitations, the ALJ did not give the opinions of Dr. Flynn and Ms. Garza proper weight. "[L]icensed or certified psychologists," such as Dr. Flynn, are "acceptable medical sources" of evidence to support a claim of impairment. 20 C.F.R. § 404.1513(a)(2). Therapists, such as Ms. Garza, can be considered as other medical sources who may

provide evidence to show the severity of impairments and how they affect the claimant's ability to work. § 404.1513(d)(1). The ALJ characterized Ms. Garza as "not an accredited medical source," without acknowledging that her opinion could be considered under § 404.1513(d)(1).

The ALJ also did not give the opinion of Dr. Flynn controlling weight. See 20 C.F.R. § 404.1527(d)(2) ("Generally, we give more weight to opinions from your treating sources"). The amount of weight to be given to a medical opinion is governed by several factors, including: whether the source of the opinion has treated the claimant and, if so, the length of the treatment relationship, the frequency of treatment, whether the source supports the proffered opinion with relevant medical evidence, whether the opinion is consistent with the medical record as a whole, and whether the source is a specialist. 20 C.F.R. § 404.1527(d).

In discounting the opinions of Dr. Flynn and Ms. Garza, the ALJ characterized plaintiff's treatment as "brief and relatively infrequent." A review of the record establishes that plaintiff had fourteen appointments between intake on September 13, 2006, and the completion of the RFC nineteen weeks later on January 27, 2007; some of those sessions lasted 80 to 90 minutes. Thus, the record does not support a finding that treatment was "infrequent." The treatment period was relatively short, however, which subtracts from the weight to be given to the RFC. The Court finds it significant, however, that plaintiff's motor responses actually deteriorated in that brief time.

The ALJ also noted that plaintiff did not abide by the recommendation to participate in twice-weekly treatment. However, Dr. Johns reported that plaintiff's finances prevented him from receiving the necessary treatment, a factor that the ALJ did not address. See Blakeman v. Astrue, 509 F.3d 878, 888 (8th Cir. 2007) (ALJ erred in discounting claimant's credibility based on lack of treatment where there was evidence that lack of treatment was due to inability to pay). Furthermore, there is no indication that plaintiff failed to appear for any scheduled appointments. This fact tends to counteract any negative inference to be drawn from plaintiff's inability to participate to the fullest extent in recommended treatment.

The opinions of Dr. Flynn and Ms. Garza regarding plaintiff's limitations are supported by test results and behavioral observations. In addition, their opinions are consistent with the observations of plaintiff's physicians and the consultative examiner. Indeed, there is no medical evidence in the record that contradicts the opinion of Dr. Flynn and Ms. Garza regarding plaintiff's limitations. Thus, the Court concludes that the ALJ did not give proper weight to the opinions of Dr. Flynn and Ms. Garza, or the RFC completed by Ms. Garza.

In summary, the Court concludes that the ALJ's determination of plaintiff's RFC is not supported by substantial evidence on the record as a whole. When the vocational expert was presented with a hypothetical that included a proper recitation of plaintiff's limitations as found by Dr. Johns, the expert opined that there

were no jobs in the national economy that such a hypothetical individual could perform.  Plaintiff is thus disabled within the meaning of the Social Security Act.  <u>Taylor v. Chater</u>, 118 F.3d 1274, 1279 (8th Cir. 1997).

## VI.  Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is not supported by substantial evidence in the record as a whole.  The decision, therefore, will be reversed and remanded under sentence 4 of 42 U.S.C. § 405(g).  Upon remand the Commissioner should award disability benefits based upon a period of disability beginning April 4, 2006.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [#13] is **granted**.

**IT IS FURTHER ORDERED** that, pursuant to sentence 4 of 42 U.S.C. § 405(g), the decision of the Administrative Law Judge is reversed and the matter is remanded to the Commissioner for an

award of disability benefits based upon a period of disability beginning on April 4, 2006.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 18th day of August, 2007.